1
2
3
4
5
6
7

8           UNITED STATES DISTRICT COURT

9           SOUTHERN DISTRICT OF CALIFORNIA

10

11 | GLAM AND GLITS NAIL DESIGN,          Case No.:  21-cv-0052-GPC-DEB
   | INC., a California corporation,
12 |                                      **ORDER:**
                              Plaintiff,
13 |                                      **(1) GRANTING IN PART AND**
   | v.                                   **DENYING IN PART THE MOTIONS**
14 |                                      **TO DISMISS; AND**
   | #NOTPOLISH, INC., a California
15 | corporation; NHU XUAN LAI, an
   | individual; and DOES 1 THROUGH 10,   **(2) DENYING MOTION TO STRIKE**
16 | inclusive,
17 |                                      **[ECF Nos. 26–28]**
   |                             Defendants.
18

19                        <u>**INTRODUCTION**</u>

20         Before this Court are two Motions to Dismiss and a Motion to Strike, filed by

21 Defendants #Notpolish, Inc. ("NotPolish"), and Nhu Xuan Lai ("Ms. Lai").  ECF Nos.

22 26–28.  Plaintiff Glam and Glits Nail Design, Inc. ("G&G") filed Oppositions to each,

23 and the Defendants filed their corresponding Replies.  *See* ECF Nos. 30, 31, 34–36.

24 Upon reviewing the moving documents and the case record, the Court **GRANTS in part**

25 **and DENIES in part** the two Motions to Dismiss, and **DENIES** the Motion to Strike.

26 G&G may amend the complaint to address any issues raised by the Court in this Order.

27                                  1

28

# BACKGROUND

## I. Procedural History

G&G filed the original Complaint on January 12, 2021. ECF No. 1. While NotPolish and Ms. Lai moved to dismiss the Complaint on March 11, 2021, ECF Nos. 18, 19, G&G filed its First Amended Complaint ("FAC") on March 25, 2021, ECF No. 22, and the Court denied the two initial motions to dismiss as moot on March 31, 2021, ECF No. 25.

The FAC now alleges eleven causes of action: (1) misappropriation of trade secrets in violation of the federal Defend Trade Secrets Act; (2) misappropriation of trade secrets in violation of the California Uniform Trade Secrets Act; (3) defamation; (4) violation of the Computer Fraud and Abuse Act; (5) conversion; (6) trespass to chattels; (7) breach of the duty of loyalty; (8) tortious interference with actual economic relations; (9) tortious interference with prospective economic relations; (10) unfair competition; and (11) conspiracy. *See* ECF No. 22. Count Seven is directed only against Ms. Lai, whereas the other causes of action are against all Defendants.

On April 8, 2021, Ms. Lai filed a Motion to Dismiss and a Motion to Strike, ECF Nos. 26, 28, and NotPolish filed a Motion to Dismiss, ECF No. 27. Of note, whereas NotPolish moves to dismiss all causes of action alleged in the FAC, Ms. Lai's Motion to Dismiss does not address Counts Three (defamation) and Eleven (conspiracy). Instead, Ms. Lai seeks to dispose of certain (but not all) defamation allegations via her Motion to Strike. On April 22, 2021, G&G filed a consolidated Opposition to the two Motions to Dismiss, and an Opposition to the Motion to Strike. ECF Nos. 30, 31. The Defendants filed their corresponding Replies on April 29, 2021. ECF Nos. 34–36.

On June 3, 2021, G&G and NotPolish provided Notices of Supplemental Authority, *see* ECF Nos. 38, 39, in which the Supreme Court decided on an issue affecting G&G's allegations relating to the Computer Fraud and Abuse Act.

## II.    Factual Allegations

This lawsuit concerns a dispute between G&G, a nail care products manufacturer and vendor, versus NotPolish, a business competitor of G&G, and Ms. Lai, a former employee of G&G who later became an employee of NotPolish.  The parties disagree on the motives behind G&G's lawsuit and the nature of the allegations.  *See, e.g.*, ECF No. 28-1 at 1.[1]  But at least for the purposes of adjudicating the Motions in front of this Court,[2] the alleged facts are as follows.

### A.    G&G and Its Confidential Customer Information

G&G started its business in 2007.  Over the past 13 years, it cultivated customer relationships with numerous nail supply stores across the United States, many of which are owned and operated by Vietnamese Americans.  *See* ECF No. 22 at 5.  As part of managing customer relationships, G&G has developed what it refers to as the "Glam and Glits Confidential Customer Information" ("Information"), which includes: "customer lists, the non-public personal mobile numbers of each of the owners and operators of [G&G's] customers and distributors, each customer's account purchasing history, the pricing for each account, and an understanding of unique, customer-specific product preferences."  *See id.* ¶ 14.  According to G&G, it would be nearly impossible to "reverse engineer" any of the Information, for the details are not generally known to the industry, nor has G&G disclosed the Information (or any part thereof) to the public.  *See id.* at 6–8.

G&G has taken several measures to protect the secrecy of the Information.  *See id.* ¶ 21.  For example, G&G limits the disclosure of the Information to select employees.

---

[1] References to specific page numbers in a document filed in this case correspond to the page numbers assigned by the Court's Electronic Case Filing ("ECF") system.

[2] As discussed *infra* pages 7–8 of this Order, at the motion to dismiss stage of the lawsuit, the Court assumes the factual allegations as true and construes all inferences from them in the light most favorable to Plaintiff G&G.

The employees who may access the Information must only use their company-issued iPhone that may only be synched to the company iCloud database. G&G also "requir[es] that all employees return all confidential and proprietary information and trade secrets upon termination of their employment; and requir[es] confidentiality from employees" on such confidential and proprietary information and trade secrets.

**B. Ms. Lai's Access to the Confidential Customer Information**

One of the employees who had access to the Information was Ms. Lai. She was employed from November 2016 to July 2020 as part of G&G's administrative team to maintain business relationships, sell products and process customer orders, expand the quantity and scope of products that customers purchased, and advise customers on the products offered by G&G. *See id.* ¶ 29. In spite of her lack of prior sales experience, Ms. Lai "was assigned a significant role in sales and customer relationship management," due to her fluency in Vietnamese for customers who preferred to conduct business in Vietnamese. *See id.* ¶ 33.

Accordingly, G&G provided Ms. Lai with a company-issued iPhone, synched to the company iCloud database. *See id.* ¶ 35. The first time G&G provided the company iPhone was around November 2016. At that time, Ms. Lai agreed to: (1) maintain the Information in confidence and use it only for purposes of her employment with G&G, (2) not conduct any G&G business on any personal cellphone, and (3) conduct all work-related communications only on the company iPhone, all per the instructions provided by G&G. *See id.* at 11–12.

Around October 2018, G&G provided Ms. Lai with a new company iPhone. *See id.* ¶ 42. According to the FAC, Ms. Lai copied what was in the former company iPhone and transferred it to the new company iPhone, thus still having access to the Information. *See id.* ¶ 44. However, she did not synch the new company iPhone to the company iCloud, and instead synched it to her personal iCloud account. *See id.* ¶ 45. This had two

4

effects. First, all the Information was now also saved to Ms. Lai's personal iCloud storage. Second, new information Ms. Lai generated during her employment after October 2018 was not saved to the company iCloud, but to Ms. Lai's personal iCloud instead. *See id.* at 12–13.

### C. Ms. Lai's Job Switch to NotPolish

G&G suspects that "as early as late-November or early December 2019," while still employed by G&G, Ms. Lai "conceived and executed a plan" to redirect business to NotPolish, to which NotPolish "was aware of, agreed to, and/or assisted in" Ms. Lai's plan. *See id.* ¶¶ 50, 51. In the FAC, G&G presents several supporting allegations. First, Ms. Lai and one of the co-owners of NotPolish knew each other since high school. *See id.* ¶¶ 54, 55. Second, while being angry about a "Secret Santa" game at the company gathering in December 2019, Ms. Lai allegedly said she could get a job at NotPolish "anytime," or words to that effect. *See id.* ¶ 58. Third, allegedly Ms. Lai's attitude during her employment changed around that time as well. Whereas in the past Ms. Lai generally sought to improve her performance upon a question or reprimand, starting around December 2019, on more than one occasion she did not apologize or try to fix her performance, simply asking "Am I fired?" *See id.* ¶ 59.

Ms. Lai's employment with G&G ended on July 22, 2020.[3] According to G&G, Ms. Lai "tried to avoid" turning in the company iPhone when her employment ended, and a different employee secured the company iPhone instead. *See id.* at 15. And it was that day, upon receiving a text message from Ms. Lai, when G&G's CEO first learned that Ms. Lai had not been complying with the company policy (including the iPhone-iCloud synch). *See id.* at 16. Ms. Lai's text message demonstrated that she knew about the

---

[3] Paragraph 62 of the FAC states "2021," but the case record and other parts of the FAC indicate that this is a typo. *See, e.g.*, ECF No. 22 at ¶ 29.

company's policy and her failure to comply with it, and that she was aware of such failure. *See id.* at 17. In sum, G&G alleges that Ms. Lai, by synching the company iPhone to her personal iCloud, took the Information with her upon leaving G&G.

### D. NotPolish and Ms. Lai's "Campaign" Against G&G

According to G&G, NotPolish and Ms. Lai soon after contacted "each and every" Vietnamese-speaking customer who appeared in the Information, and attempted to redirect their purchases from G&G to NotPolish. As supporting allegations, G&G references certain customers who reached out to G&G about Ms. Lai's "constant" and "repeated" calls, in which Ms. Lai could only have known the customers' direct numbers because they were contained in the Information. *See id.* at 18–19.

G&G also alleges that NotPolish and Ms. Lai "orally published defaming lies about Glam and Glits' CEO, falsely accusing him of using illegal drugs." *Id.* ¶ 79. According to G&G, a customer relayed the false statements she had been told by Ms. Lai. *Id.* ¶ 81. In addition, the Defendants spread "false and deceptive statements about the Glam and Glits workplace on social media, threatening potential witnesses, and interfering with Glam and Glits' relationships with its employees." *Id.* ¶ 82. In general, the FAC provided social media posts by Ms. Lai, which included statements such as "Calling CVS 7th times to schedule Covid testing cus people at work are getting infected," "snitches get stitches" (allegedly directed against G&G employees), and "they used to put me in the back cus they said I'm too Asian and the American looking one can take the front seats." *See id.* at 21–30. The FAC also provided social media posts in which Ms. Lai is allegedly referring to the G&G workplace as "prison." *See, e.g.*, *id.* ¶ 98. In some of these social media posts, NotPolish's co-owner commented on them in support. *See, e.g.*, *id.* ¶ 95.

The FAC states that as a result of the Defendants' actions, G&G's business opportunities, competitive edge, confidential and proprietary information and trade

6

secrets, and existing and potential relationships (with employees, customers, and other business associates) have been, and will continue to be, irreparably harmed. This is because while the value of the relationships are difficult to quantify, these relationships are cultivated over years, and once lost to a competitor, it takes significant time and resources to restore them. *See id.* at 30–31.

## **MOTION TO DISMISS**

Assuming the factual non-legal conclusions in the FAC as true and making inferences most favorable to G&G, the party opposing the Motions to Dismiss, the Court concludes that most of G&G's claims survive. While the Court **DISMISSES** Counts Four to Six and the related conspiracy claims, this Court also **GRANTS** an opportunity for G&G to amend its complaint so that it can cure the defects that the Court raised in this Order.

### I. **Legal Standard**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") tests the sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). This is to make sure "that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Dismissal under Rule 12(b)(6) is warranted if the complaint either lacks a cognizable legal theory, or lacks sufficient facts alleged to support a cognizable legal theory. *See Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Navarro*, 250 F.3d at 732). While a plaintiff need not give "detailed factual allegations," a plaintiff must plead sufficient facts that, if true, "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

1 | *v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 547). A claim is

2 | facially plausible when the factual allegations permit "the court to draw the reasonable

3 | inference that the defendant is liable for the misconduct alleged." *Id.* In other words,

4 | "the nonconclusory 'factual content,' and reasonable inferences from that content, must

5 | be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret*

6 | *Service,* 572 F.3d 962, 969 (9th Cir. 2009). Determining the plausibility of the claim for

7 | relief is a "context-specific task that requires the reviewing court to draw on its judicial

8 | experience and common sense." *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion to dismiss, the court assumes the truth of all

10 | factual allegations and construes all inferences from them in the light most favorable to

11 | the non-moving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002). At the

12 | same time, legal conclusions need not be taken as true merely because they are in the

13 | form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003).

14 | When ruling on the motion to dismiss, the court may consider the facts alleged in the

15 | complaint, documents attached to the complaint, documents relied upon but not attached

16 | to the complaint when authenticity is not contested, and matters of which the court takes

17 | judicial notice. *Lee v. Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001). Allegations

18 | based "upon information and belief" may also be considered if "the facts are peculiarly

19 | within the possession and control of the defendant or where the belief is based on factual

20 | information that makes the inference of culpability plausible." *See Soo Park v.*

21 | *Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (citing *Arista Records, LLC v. Doe 3*, 604

22 | F.3d 110, 120 (2d Cir. 2010); *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995)).

23 | **II.  Discussion**

24 | Most of G&G's Causes of Action prevail because its 59-page FAC sufficiently

25 | establishes the factual predicates that could plausibly lead to the allegations that it makes.

26 | But certain Counts do not. The Court rejects Count Four because the Computer Fraud

8

and Abuse Act does not cover misappropriation of information that Ms. Lai had authorization to access. The Court also rejects Count Five and Six, because these common law claims are displaced by the statute. Finally, the Court rejects Count Eleven, a conspiracy claim, but only as it pertains to the other Counts that the Court rejected; conspiracy is not an independent civil wrong and requires an underlying wrongful act.

### A. Misappropriation of Trade Secrets (Counts One and Two)

Both Defendants challenge G&G's claims for misappropriation of trade secrets, under both federal law (the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*) and state law (the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426, *et seq.*). *See* ECF No. 26-1 at 7–8; ECF No. 27 at 16–22. "Courts have analyzed these [federal and state law] claims together because the elements are substantially similar." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). Specifically, G&G must prove that: (1) G&G possessed a trade secret; (2) the Defendant misappropriated the trade secret; and (3) the misappropriation caused or threatened damage to G&G. *See id.* at 657–58 (citing 18 U.S.C. § 1839(5)); *accord Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 220 (2010) (citing Cal. Civ. Code §§ 3426.1 to 3426.3), *as modified on denial of reh'g* (May 27, 2010), *and disapproved of on other grounds by Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310 (2011). NotPolish challenges all three elements, whereas Ms. Lai challenges the second element. At this stage of the lawsuit however, G&G alleged sufficient facts on all three elements, thus plausibly alleging that Defendants misappropriated trade secrets to incur damages.

### 1. Trade Secret

"Trade secret" is defined as "information that 'the owner thereof has taken reasonable measures to keep . . . secret' and that 'derives independent economic value, actual or potential, from not being generally known to . . . another person who can obtain economic value from the disclosure or use of the information.'" *Attia v. Google LLC*,

9

983 F.3d 420, 424 (9th Cir. 2020) (citing 18 U.S.C. § 1839(3)); *see also InteliClear*, 978 F.3d at 657 (discussing the three elements of trade secret as "(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret"); *cf.* Cal. Civ. Code § 3426.1(d). "To prove ownership of a trade secret, plaintiffs 'must identify the trade secrets and carry the burden of showing they exist.'" *InteliClear*, 978 F.3d at 658 (citation omitted). Further, the subject matter of the trade secret must be described "with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Id.* (alterations in original) (citation omitted).

Based on the standard above, the Information may qualify as a trade secret. Contrary to NotPolish's characterizations of it, the Information is more than just a "client list." It includes non-public personal cellphone numbers of the owners and operators of G&G's customers and distributors who prefer conducting business in Vietnamese, the customers' and distributors' account purchasing histories, their corresponding pricing tiers, and their product and billing preferences. *See* ECF No. 22 at 5–6. These details cannot be found in any public domain, nor has G&G ever publicly disclosed them. Instead, the CEO of G&G himself compiled them over many years and took various measures to keep the Information exposed as little as possible. *See id.* at 6–9; *cf. Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1521–22 (1997) (distinguishing "mere identities and locations of customers where anyone could easily identify the entities as potential customers" from "where the employer has expended time and effort identifying customers with particular needs or characteristics"). And it is easy to see how knowing private cellphone numbers of the owners/operators and their preferences to the most intricate detail would provide a competitive edge. *See, e.g.*, ECF No. 22 at ¶ 19.

/ / /

## 2. Misappropriation

The term "misappropriation" is defined in 18 U.S.C.§ 1839(5) and captures a variety of conducts. Here, there are two separate conducts at issue: one committed by Ms. Lai, and the other by NotPolish. At the motion to dismiss stage of the lawsuit, the FAC alleged sufficient facts to establish a plausible claim of misappropriation for each Defendant's conduct. The main problem with the Defendants' arguments is that they rely on cherry-picked allegations. The FAC alleges far more than the select passages that the Defendants challenge. The FAC as a whole generates other plausible scenarios of misappropriation that passes the pleading standard yet also circumvents the Defendants' contestation of the facts.

It is plausible that Ms. Lai "misappropriated" the trade secrets. Under Section 1839(5)(B), misappropriation includes use of a trade secret without consent by a person who, at the time of the use, "knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." *See id.* § 1839(5)(B)(ii). As alleged, Ms. Lai used a trade secret by contacting G&G's Vietnamese-speaking customers via their personal cellphone numbers. *See* ECF No. 22 at 18. This was without G&G's consent. And she knew or had reason to know that such Information was to be remained confidential under G&G's company policy. *See id.* ¶¶ 21, 23, 24, 33–38. Therefore, Ms. Lai "misappropriated" the trade secret by using G&G's Information without G&G's consent even though she knew the Information was to be kept in secret.[4]

---

[4] The Court's analysis also demonstrates that G&G need not rely on the term "improper means," defined in Section 1839(6), to plausibly allege misappropriation against Ms. Lai. *See, e.g.*, 18 U.S.C. § 1839(5)(B)(ii)(II). Therefore, while Ms. Lai argues that she did not misappropriate the Information because she did not acquire it by or through "improper means," this will not defeat Counts One and Two. Instead, the Court will discuss the

Actively using the Information (even after her employment with G&G was terminated) is "more than" mere possession of it.  *Cf. Power Integrations, Inc. v. De Lara*, No. 20-cv-410-MMA (DEB), 2020 U.S. Dist. LEXIS 142851, at *35 to *36 (S.D. Cal. Aug. 10, 2020) (discussing how "mere possession" of the trade secret is not enough).

Of note, while Ms. Lai argues that her request to G&G's CEO to "remove" her access to G&G's Information evinces innocence, *see* ECF No. 26-1 at 8, this is not something the Court considered.  Under the legal standard for a motion to dismiss, all inferences in the factual allegations are drawn in favor of the non-movant, G&G.  To the extent that G&G presents an alternative interpretation of the said-facts, *see* ECF No. 22 at 15–18, the Court lends credence to G&G's version of the events.

It is also plausible that NotPolish "misappropriated" the trade secrets.  Section 1839(5)(A) states that misappropriation includes "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."  18 U.S.C. § 1839(5)(A).  The term "improper means" includes "breach of a duty to maintain secrecy."  *Id.* § 1839(6)(A).  Applying these two provisions to the allegations (and the related inferences most favorable to G&G), the following is plausible.  First, NotPolish acquired the Information.  After all, NotPolish hired Ms. Lai, and Ms. Lai was reaching out to private cellphone numbers to advance NotPolish's sales.  Second, NotPolish knew or had reason to know that the Information (such as Vietnamese American business owners' private cellphone numbers and their tailored customer preferences) was acquired by a breach of duty to maintain the Information's confidentiality.  *See* ECF No. 22 at 11–13 (discussing company policy on the Information and the duty to insulate the company iPhone and iCloud from one's personal phone and

---

term in greater detail when discussing the allegations against NotPolish, *infra* pages 12–13 of this Order.

iCloud, and further discussing Ms. Lai's awareness of these details as she was instructed so). No part of the case record indicates that Ms. Lai was acting as a lone wolf. Instead, the FAC indicates that she was making solicitations in the capacity as NotPolish's employee. *See id.* at 18–19. Thus, to the extent that NotPolish was supervising Ms. Lai's handling of business administration, it is plausible that the nature of the Information (specifically, its confidentiality and Ms. Lai's violation thereof) would have surfaced.

NotPolish primarily argues that G&G's accusations are made upon information and belief, and that the three predicated allegations to form such information and belief are insufficient. *See ECF No. 27 at 19–21.* Here, NotPolish is referring to: (1) Ms. Lai's relationship with NotPolish's CEO that go back to high school, (2) the "Secret Santa" incident where allegedly Ms. Lai said that she could get a job at NotPolish "anytime," and (3) NotPolish's CEO commenting on Ms. Lai's social media posts. *See id.* at 19–20. NotPolish views these incidents as tenuous to the cause of action, and wholly innocuous.

The Court disagrees with NotPolish's construction of the FAC because the FAC alleges more than that to support G&G's information and belief. *Cf. Soo Park*, 851 F.3d at 928 (permitting allegations on information and belief "where the belief is based on factual information that makes the inference of culpability plausible"). For example, G&G expressly mentions specific customers that informed G&G relating to Ms. Lai's solicitations, and how she "pressured" them to purchase NotPolish products instead. *See ECF No. 22 at ¶¶ 75, 76.* Further, G&G alleges Ms. "Lai was expressly instructed (and agreed) to maintain the Glam and Glits Confidential Information in confidence and to use it only for purposes of her employment with Glam and Glits." *See id.* ¶ 36. These two predicate allegations, alone, make the inference of culpability plausible.[5] With specific

_____

[5] As to the three allegations that NotPolish challenges, the Court views them as providing context to the other allegations of breach. Important to keep in mind, the Court constructs the FAC as a whole, in which case the three allegations narrate a relationship

examples of an alleged breach, the pleading is distinguishable from NotPolish's supporting cases of *Menzel v. Scholastic, Inc.*, No. 17-cv-05499-EMC, 2018 U.S. Dist. LEXIS 44833, at *4 to *5 (N.D. Cal. Mar. 19, 2018) (discussing how plaintiff "has not pointed to one concrete example of infringement") and *Power Integrations*, 2020 U.S. Dist. LEXIS 142851, at *35 to *36 (requiring more than "mere possession").

### 3. Damages

Finally, NotPolish asserts that G&G has failed to plead sufficient facts to demonstrate damages caused by the alleged misappropriation. *See* ECF No. 27 at 21–22. In its FAC, G&G has offered specific episodes of customers "complaining" about Ms. Lai calling their personal cellphones. *See, e.g.*, ECF No. 22 at ¶ 75. The FAC claims that after her separation from G&G, Ms. Lai contacted and "told" a G&G customer that G&G's CEO abused illegal drugs which led the customer to insist that the co-owner of G&G supervise her account rather than the CEO. *Id.* ¶ 81. The FAC further elaborates that the Vietnamese American nail care supply market is a reputation-sensitive industry, in which appearances of mismanagement could have material, financial consequences. *See, e.g., id.* ¶ 25. In fact, the FAC discusses G&G losing at least one sale/customer because of the Defendants' acts. *See, e.g., id.* ¶¶ 27, 202. Ultimately, G&G has alleged sufficient facts to plausibly claim that Ms. Lai and NotPolish's misappropriation of Information "caused or threatened damage."

### B. Defamation (Count Three)

NotPolish also moves to dismiss G&G's defamation claim. *See* ECF No. 27 at 22–23. Under California law, "[t]he elements of a defamation claim are (1) a publication that

_____

between Ms. Lai and NotPolish's CEO. The relationship dates back since high school, and was close enough for a job opportunity and even rapport outside of work. And given such relationship, it is plausible the CEO was aware of Ms. Lai's role in G&G and her access to important industry knowledge, including G&G's proprietary information.

is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." *Med. Marijuana, Inc. v. ProjectCBD.com*, 46 Cal. App. 5th 869, 888 (2020) (alteration in original) (citation omitted). The Court focuses its inquiry on NotPolish's conduct because the Motion to Dismiss only seeks to remove NotPolish from the defamation claim.[6]

Here, NotPolish's arguments boil down to the fact that it was Ms. Lai who made the defamatory statements, not NotPolish. This is unconvincing since Ms. Lai has been an employee of NotPolish. *See* ECF No. 22 at ¶ 4. Setting aside the issue of conspiracy, NotPolish could still be liable as Ms. Lai's supervisor under the doctrine of respondent superior. *See Kelly v. Gen. Tel. Co.*, 136 Cal. App. 3d 278, 284 (1982); *see also Zoellner v. City of Arcata*, No. 18-CV-04471-EMC, 2021 WL 1531169, at *8 (N.D. Cal. Apr. 19, 2021) (citing *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1080 (9th Cir. 2003)).

Independent from the liability stemming from NotPolish's supervisory capacity over Ms. Lai, the Court views one of NotPolish's social media comments as a sufficient basis to support the defamation claim. NotPolish's comment "Love this [heart emoji]" was a direct response to Ms. Lai's post "When they told me I can't be on camera because I'm too Fobby, Too Asian, make us look too cheap cheap….. look at your girl now. Notpolish #makingmillions #notPolish." *See* ECF No. 22 at 28. At minimum, NotPolish affirmed and validated Ms. Lai's statement. To the extent that Ms. Lai's statement could be considered defamatory (because it could be accusing G&G of racially/culturally discriminatory practices), a statement affirming such could be defamatory as well.

---

[6] In challenging G&G's defamation claims, Ms. Lai filed a Motion to Strike instead, but the Motion is limited to certain parts of the defamation claim, and not all. *Compare* ECF No. 28 at 1 (requesting the Court to strike paragraphs 82–100, 139, and 140), *with* ECF No. 22 at 36–39 (discussing the Third Cause of Action from paragraphs 136 to 153). The Court discusses the Motion to Strike in further detail *infra* pages 25–27 of this Order.

15

On NotPolish's one-line assertions on G&G's supposed failure to establish injury and damages, *see* ECF No. 27 at 23; ECF No. 34 at 7, the FAC sufficiently pled the issue, for reasons similar to this Order's discussion *supra* page 14.

### C.    Computer Fraud and Abuse Act (Count Four)

Next, Defendants Ms. Lai and NotPolish move to dismiss G&G's Fourth Cause of Action which is grounded in the Computer Fraud and Abuse Act ("CFAA").  *See* ECF No. 26-1 at 6–7; ECF No. 27 at 23–26.  A person is liable under the CFAA if the person, among other things, "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." *See* 18 U.S.C. § 1030(a)(2).  At the same time, "CFAA is best understood as an anti-intrusion statute and not as a 'misappropriation statute,'" for "[t]he CFAA was enacted to prevent intentional intrusion onto someone else's computer—specifically, computer hacking."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 1000 (9th Cir. 2019) (citing *United States v. Nosal* ("*Nosal I*"), 676 F.3d 854, 857–58 (9th Cir. 2012)).

Specifically, the CFAA identifies two different ways a defendant could be liable, but Ninth Circuit precedents make clear that the facts in this case are outside of the statute's scope.  First, a person could access a computer "without authorization."  *See* 18 U.S.C. § 1030(a)(2).  This violation occurs "when the person has not received permission to use the computer for any purpose (such as when a hacker accesses someone's computer without any permission), or when the employer has rescinded permission to access the computer and the defendant uses the computer anyway."  *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1066 (9th Cir. 2016) (citing *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1135 (9th Cir. 2009)), *cert. denied*, 138 S. Ct. 313 (2017); *see also United States v. Nosal* ("*Nosal II*"), 844 F.3d 1024, 1029 (9th Cir. 2016), *cert. denied*, 138 S. Ct. 314 (2017).  The "without authorization" prong is inapplicable to the facts because Ms. Lai had authorization to "access" the company iPhone and iCloud as a

G&G employee.  *Cf. Brekka*, 581 F.3d at 1135 (deciding that employee emailing documents from his work computer to himself and his wife was not access "without authorization" since he "was given permission to use [the employer's] computer").

Second, a person could "exceed[] authorized access," 18 U.S.C. § 1030(a)(2), which is defined as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter," *id.* § 1030(e)(6).  But most importantly, the Ninth Circuit does not read the statute to penalize "any unauthorized use of information obtained from a computer," and limits this provision to "inside hackers (individuals whose initial access to a computer is authorized but who access unauthorized information or files)."  *Nosal I*, 676 F.3d at 858–59 (emphasis removed).  The Ninth Circuit has consistently held that "the plain language of the CFAA 'target[s] the unauthorized procurement or alteration of information, not its misuse or misappropriation.'"  *Id.* at 863 (alteration in original) (citations omitted); *see also Nosal II*, 844 F.3d at 1034 ("Because [defendants] had authority to access the company computers, we affirmed the district court's dismissal of the CFAA counts related to the period when the [defendants] were still employed at [their firm].").  Here, the "synching" of the Information occurred when Ms. Lai indeed had the authorization to obtain and access the Information as a G&G employee, thus she did not "exceed authorized access."  Whether Ms. Lai ultimately misappropriated the Information she was authorized access to is a separate question outside CFAA's scope.

As the Defendants point out, *see* ECF No. 34 at 7; ECF No. 36 at 7, G&G concedes the lack of a valid CFAA claim under Ninth Circuit law, for all of G&G's brief focused on how deciding based on these precedents was "premature" due to a pending Supreme Court case resolving an apparent circuit split between the Ninth and Eleventh Circuit.  *See* ECF No. 31 at 15–18.  Further, G&G informs the Court that *hiQ Labs, Inc.*, / / /

938 F.3d 985, the most recent case pertaining to the "without authorization" prong, is awaiting a decision on a petition for certiorari.

The Supreme Court has spoken. It reversed and remanded the Eleventh Circuit decision that served the basis for G&G's claim for untimeliness. *Van Buren v. United States*, -- S. Ct. --, No. 19-783, 2021 WL 2229206, at *3 (U.S. June 3, 2021). In fact, the Supreme Court affirmed the Ninth Circuit's reasoning. According to the Supreme Court, the CFAA was designed to protect computers from "outside hackers" (the "without authorization" prong) and "inside hackers" (the "exceeds authorized access" prong). *Compare id.* at *9, *with Nosal I*, 676 F.3d at 858. And an expansive interpretation akin to what G&G presents "criminalizes every violation of a computer-use policy." *Compare Van Buren*, 2021 WL 2229206, at *11, *with Nosal I*, 676 F.3d at 859–60.

Regarding the certiorari petition on *hiQ Labs*, the Court agrees with the Defendants that the issue in front of this Court is categorically different from what may eventually be in front of the Supreme Court. *See, e.g.*, Petition for a Writ of Certiorari, *LinkedIn Corp. v. hiQ Labs, Inc.*, No. 19-1116 (U.S. Mar. 9, 2020). But more importantly, a potential Supreme Court decision on the matter has never been an adequate basis for this Court to withhold a decision on the Motions to Dismiss. "[O]nce a federal circuit court issues a decision, the district courts within that circuit are bound to follow it and have no authority to await a ruling by the Supreme Court before applying the circuit court's decision as binding authority." *In re Zermeno-Gomez*, 868 F.3d 1048, 1052 (9th Cir. 2017) (quoting *Yong v. INS*, 208 F.3d 1116, 1119 n.2 (9th Cir. 2000)).

**D.    Statutory Displacement (Counts Five to Ten)**

Defendants Ms. Lai and NotPolish also argue that Counts Five to Ten (conversion, trespass to chattels, breach of the duty of loyalty, tortious interference with actual and prospective economic interference, and unfair competition) should be displaced by the

/ / /

California Uniform Trade Secrets Act ("CUTSA").[7]  *See* ECF No. 26-1 at 4–6; ECF No. 27 at 26–30.  The Court agrees with the Defendants that CUTSA displaces the claims of conversion and trespass to chattels (Counts Five and Six), for these allegations are no more than restating a misappropriation of a trade secret and/or confidential information.  However, Counts Seven to Ten involve more than a misappropriation claim.  Therefore, the Court declines to dismiss these claims under the theory of CUTSA displacement.

### 1.    Applicability of CUTSA

CUTSA provides various remedies for the misappropriation of trade secrets.  *See, e.g.*, Cal. Civ. Code §§ 3426.2 to 3426.4.  Further, the savings clause in Section 3426.7 of CUTSA expressly preserves certain laws, such as "any statute relating to misappropriation of a trade secret, or any statute otherwise regulating trade secrets," or "other civil remedies that are not based upon misappropriation of a trade secret."  Courts in California read CUTSA's "comprehensive structure and breadth," combined with its express savings clause, to mean that "CUTSA provides the exclusive civil remedy for conduct falling within its terms, so as to supersede other civil remedies 'based upon misappropriation of a trade secret.'"  *See Angelica Textile Servs., Inc. v. Park*, 220 Cal. App. 4th 495, 505 (2013) (citing *K.C. Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 954 (2009)), *as modified* (Oct. 29, 2013), *as modified on denial of reh'g* (Nov. 7, 2013); *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 236 (2010), *as modified on denial of reh'g* (May 27, 2010), *disapproved on other grounds by Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310 (2011).

---

[7] The parties refer to "preemption" instead of displacement.  Case law indicates that the latter is the more appropriate term.  *See, e.g.*, *Angelica Textile Servs., Inc. v. Park*, 220 Cal. App. 4th 495, 498 n.1 (2013), *as modified* (Oct. 29, 2013), *as modified on denial of reh'g* (Nov. 7, 2013); *accord Erhart v. BofI Holding, Inc.*, -- F. Supp. 3d --, No. 15-CV-02287-BAS-NLS, 2020 WL 1550207, at *36 n.24 (S.D. Cal. Mar. 31, 2020).

Courts have identified two circumstances where CUTSA displaces certain claims. "First, CUTSA displaces claims that are 'based on the same nucleus of facts as the misappropriation of trade secrets claim for relief.'" *Erhart v. BofI Holding, Inc.*, -- F. Supp. 3d --, No. 15-CV-02287-BAS-NLS, 2020 WL 1550207, at *36 (S.D. Cal. Mar. 31, 2020) (quoting *K.C. Multimedia*, 171 Cal. App. 4th at 958). In other words, "CUTSA displaces tort claims where they 'do not genuinely allege 'alternative legal theories' but are a transparent attempt to evade the strictures of CUTSA by restating a trade secrets claim as something else.'" *Id.* (citing *Silvaco*, 184 Cal. App. 4th at 240; *K.C. Multimedia*, 171 Cal. App. 4th at 960–62).

"Second, CUTSA displaces 'all claims premised on the wrongful taking and use of confidential business and proprietary information, even if that information does not meet the statutory definition of a trade secret.'" *Id.* at *37 (citations omitted). To put it differently, if the entire basis for the claim is information "not . . . generally known to the public," the claim is considered "sufficiently close to a trade secret claim." And the fact that the information may ultimately fall short of a "trade secret" under CUTSA does not mean the claim survives CUTSA displacement. *See id.* Courts have extended this second circumstance as being under CUTSA's purview because the "prime purpose" of CUTSA "was to sweep away the adopting states' bewildering web of rules and rationales and replace it with a uniform set of principles for determining when one is—and is not— liable for acquiring, disclosing, or using 'information . . . of value.'" *See id.* (citing *Silvaco*, 184 Cal. App. 4th at 239 n.22).

The Court disagrees with G&G's position that the entire displacement issue should be preserved for summary judgment or trial. G&G primarily relies on two non-published opinions, *Amron Int'l Diving Supply, Inc. v. Hydrolinx Diving Commun., Inc.*, No. 11-CV-1890-H (JMA), 2011 U.S. Dist. LEXIS 122420, at *1 (S.D. Cal. Oct. 21, 2011), and *DJO Glob., Inc. v. Glader*, No. 3:16-cv-02208-CAB (NLS), 2016 U.S. Dist. LEXIS

197005, at *1 (S.D. Cal. Dec. 22, 2016). To start, *DJO* discusses the preservation issue in passing, and was decided based on the fact that the complaint alleged more than the misappropriation of trade secrets or non-public information. *See* 2016 U.S. Dist. LEXIS 197005, at *16 to *20. Similarly, *Amron* declined to dismiss the claims because the complaint made allegations external to trade secret misappropriation. *See* 2011 U.S. Dist. LEXIS 122420, at *27. While *Amron* observes that determining whether information constitutes a trade secret is more appropriate for summary judgment, this only pertains to the first circumstance of CUTSA displacement. Recent developments in case law indicate that the second circumstance, i.e., non-public information that may not ultimately qualify as a trade secret, can also serve as a basis for displacement. *See, e.g.*, *Erhart*, 2020 WL 1550207, at *37 (collecting cases). Indeed, plenty of cases have rejected various causes of action at the motion to dismiss stage under either of the two circumstances. *See, e.g.*, *Yeiser Rsch. & Dev. LLC v. Teknor Apex Co.*, 281 F. Supp. 3d 1021, 1050–51 (S.D. Cal. 2017); *MedImpact Healthcare Sys., Inc. v. IQVIA Inc.*, No. 19CV1865-GPC(LL), 2020 WL 5064253, at *16 to *21 (S.D. Cal. Aug. 27, 2020).

### 2. Conversion and Trespass to Chattels (Counts Five and Six)

With the above standard in mind, the Court concludes that CUTSA displaces G&G's claims of conversion and trespass to chattels. G&G appears to be mindful of the potential CUTSA displacement concern and alleges that "Defendants wrongfully took non-trade secret intangible personal property, including text messages, voicemail messages, and emails, and other information generated by Defendant Lai while she was working for Plaintiff." ECF No. 31 at 20; *see also* ECF No. 22 at ¶¶ 167, 186. While these allegations may avoid the first circumstance for displacement, they do not avoid the second circumstance for displacement. The fact that G&G considers these "intangible digital assets" as proprietary proves their exclusive—therefore, *non-public*—nature. *See* ECF No. 22 at 42–48 (considering the intangible digital assets to be "for purposes" of

G&G's business, subject to G&G's "exclusive control," and "confidential"). And to the extent that G&G considers such assets to be of value and not available to the public, CUTSA sweeps in, as indicated by recent case law. *See, e.g.*, *Erhart*, 2020 WL 1550207, at *37; *Silvaco*, 184 Cal. App. 4th at 239 n.22.

G&G attempts to argue that *SunPower Corp. v. SolarCity Corp.*, No. 12-CV-00694-LHK, 2012 U.S. Dist. LEXIS 176284, at *28 (N.D. Cal. Dec. 11, 2012), a case that the Defendants also rely on, supports G&G's position. *SunPower* reasoned that CUTSA does not displace a non-trade secret proprietary information if: (1) the information was made property by some provision of positive law on grounds that are qualitatively different from the grounds upon which the trade secrets are considered property; or (2) the wrongdoing is materially distinct from the wrongdoing alleged in the CUTSA claim. It is unclear how the allegations of the intangible digital assets satisfy either, let alone "both," ECF No. 31 at 21. The first *SunPower* condition is not met because the intangible digital assets are not "qualitatively different." As discussed in the preceding paragraph, these assets derive their value based on its non-public, exclusive nature. The second *SunPower* condition is not met because the conduct alleged is not "materially distinct." The CUTSA claim, conversion claim, and trespass to chattels claim are all grounded in Defendants "taking" an information that is exclusive and valuable.

And while G&G portrays CUTSA displacement as a "Hobbesian choice," this framing begs the question of what rightful cause of action G&G had to begin with. According to the applicable case law, G&G never had the right to a conversion or trespass to chattels cause of action because they are not materially distinguishable from a CUTSA claim. Ultimately G&G presents a false choice on the issue.

### 3. The Other Claims (Counts Seven to Ten)

In contrast, CUTSA does not displace G&G's claims concerning: the breach of the duty of loyalty, tortious interference with actual and prospective economic relations, and

unfair competition. In these causes of action, more is alleged than the usurpation of a valuable information. As G&G points out, these claims are grounded in "defamation, other false and misleading statements regarding Glam and Glits' work environment, and threats of violence against employees who cooperate with Glam and Glits against Defendants." *See* ECF No. 31 at 21. While the Defendants view these conducts as part of a broad stroke of misbehavior that G&G complains about, such a characterization is too broad. As one example, Ms. Lai's social media post on "snitches get stitches" is wholly independent from her access to the Information and/or the intangible digital assets. Similarly, the alleged social media "campaign" did not hinge on, nor require, the Information or intangible digital assets. As such, the alleged conduct is "materially distinct" from the typical misappropriation of valuable information claims.

### E. Conspiracy (Count Eleven)

Finally, NotPolish (but not Ms. Lai) seeks to dismiss G&G's conspiracy claim. Quintessential to a conspiracy claim is "the existence of an agreement" to commit a wrongful act. *See Wasco Prod., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 990–91 (9th Cir. 2006). NotPolish seeks dismissal for two reasons. First, there is no independent civil wrong of conspiracy, and to the extent that all of G&G's other claims fail as a matter of law, the conspiracy claim falls too. Second, G&G failed to provide sufficient facts to support its conclusion on the "meeting of the minds." *See* ECF No. 27 at 15–16.

As seen above, some Causes of Action have survived the Defendants' Motions to Dismiss, while some have not. Accordingly, the Court agrees with NotPolish's first reason as to the three dismissed claims. *See Liberty City Movie, LLC v. U.S. Bank, N.A.*, 824 F. App'x 505, 508 (9th Cir. 2020) (citing *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1062 (2006)) ("[A] civil conspiracy does not give rise to a cause of action unless an independent civil wrong has been committed.").

/ / /

As to NotPolish's second reason, the Court disagrees. G&G has presented sufficient facts that the Court could infer an agreement to commit the wrongs relating to the surviving claims. As an initial observation, courts may infer civil conspiracy from circumstantial evidence of the defendant's conduct. *See, e.g.*, *AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 952 (N.D. Cal. 2003) (citing *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1479 (9th Cir. 1986)); *accord Cardigan Mountain Sch. v. New Hampshire Ins. Co.*, 787 F.3d 82, 87–88 (1st Cir. 2015); *ABB Turbo Sys. AG v. Turbousa, Inc.*, 774 F.3d 979, 988 (Fed. Cir. 2014) (recognizing that certain facts, such as a guilty mens rea, "may be distinctively in the defendant's possession, requiring that the threshold standard of plausibility be applied to more circumstantial evidence"); *cf. Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 903 (9th Cir. 2013) (citing Fed. R. Civ. P. 9(b)) (discussing how "conditions of a person's mind may be alleged generally").

Of course, certain parts of the FAC are wholly conclusory, and the Court will not consider such statements to decide on G&G's conspiracy claims. *See, e.g.*, ECF No. 22 at ¶ 234 ("Defendants had a meeting of the minds on this object or course of action and committed one or more overt acts to further the object or course of action."). But not all of G&G's allegations are legal conclusions, and these non-conclusory allegations plausibly support a conspiracy related to the surviving claims. *Cf. Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048–49 (9th Cir. 2008) (requiring more than a "rational, legal business behavior by the defendants" and focusing on "who, did what, to whom (or with whom), where, and when?"). G&G claims that NotPolish knew or had reason to know that proprietary information relating to Vietnamese American business owners' private cellphone numbers and their tailored customer preferences was acquired by Ms. Lai and used on behalf of NotPolish in breach of her duty to maintain the Information's confidentiality. *See, e.g.*, ECF No. 22 at 13–15. Further, G&G alleges that Ms. Lai and NotPolish "together" made advances to G&G's Vietnamese-speaking customers. *See id.*

¶ 73; *see also* ECF No. 31 at 8 (discussing how Ms. Lai reached out to the customers "on behalf of" NotPolish).  These facts are bolstered by the prior relationship Ms. Lai and NotPolish's CEO had (further explained *supra* note 5).  In addition, NotPolish posted a comment that affirmed Ms. Lai's statements which could potentially be considered defamatory against G&G, as discussed *supra* page 15.  At this stage, the pleading satisfies Rule 12(b)(6).

## III.    Leave to Amend

Ultimately, the Court has dismissed Counts Four to Six, and the Count of conspiracy over Counts Four to Six.  The Court dismisses these Causes of Action without prejudice because an amendment could potentially cure the defects.  *Cf. Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . that the complaint could not be saved by amendment."); Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires.").

## <u>MOTION TO STRIKE</u>

Independent from the Motions to Dismiss, Ms. Lai filed a Motion to Strike.  Specifically, Ms. Lai requests the Court to strike paragraphs 82 to 100, 139, and 140 in the FAC.  *See* ECF No. 28 at 1.  These passages are primarily Ms. Lai's social media posts, including screenshots thereof.

A court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial . . . ."  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (citation omitted).  However, such motions "are generally regarded with disfavor because of the limited importance of pleading in federal practice, and because they are often used as a delaying tactic."  *Gaines v. AT&T Mobility*

*Servs.*, LLC, 424 F. Supp. 3d 1004, 1014 (S.D. Cal. 2019) (quoting *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1152 (C.D. Cal. 2003)), *appeal dismissed*, No. 19-56473, 2020 WL 7586969 (9th Cir. Nov. 20, 2020). As such, they "are generally not granted unless it is clear that the matter sought to be stricken could have no possible bearing on the subject matter of the litigation." *Id.* (quoting *Griffin v. Gomez*, No. C 98-21038 JW (NJV), 2010 WL 4704448, at *4 (N.D. Cal. Nov. 12, 2010)). *See generally* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (3d ed., updated April 2021) (discussing how courts deny such motions unless there is "no possible relation" to the subject matter and there may be "significant prejudice" to any party, and how "[a]ny doubt . . . should be resolved in favor of the non-moving party").

Ms. Lai fails to overcome this high burden of persuasion. The social media posts are at the crux of G&G's claims such as defamation, tortious interference with actual and prospective economic interference, and unfair competition. Some are offered to support the alleged threats made by Ms. Lai to other G&G employees. *See, e.g.*, ECF No. 22 at ¶¶ 87, 89. Others are alleged publications of false and defamatory facts, such as: (1) a work environment that treats employees poorly, *see, e.g.*, ECF No. 22 at ¶¶ 83, 85, 92, 93, 98 ("#toxicworkenvironment," "prison," "put us through hell"), (2) disregard for employee safety during times of COVID-19, *see, e.g., id.* ¶ 84, and (3) racially and culturally discriminatory workplace practices,[8] *see, e.g., id.* ¶¶ 94–96. Finally, the social media posts by NotPolish's CEO, *see, e.g., id.* ¶¶ 95, 100, may evince NotPolish's role in the entire act, such as misappropriation of trade secrets, defamation, or conspiracy of any of the causes of action. Ms. Lai may consider many of these statements to be opinions (such as its reference to "prison"), but Ms. Lai's own conception of whether the social

---

[8] While Ms. Lai argues that the references to "they" in these social media posts are ambiguous, *see* ECF No. 28-1 at 5–6, ambiguity favors G&G and not the Defendants.

media posts are matters of opinion versus fact does not persuade the Court to strike the posts.

Ms. Lai relatedly avers that including the images in the FAC is not necessary. But ultimately the same images will likely resurface as evidentiary exhibits to resolve many—if not all—of G&G's claims. For example, to affirm that Ms. Lai (or NotPolish) made certain statements against G&G on social media, G&G will likely need to present the images that contain the statements, which will be a matter of public record.

Given the potential significance of these social media posts, the Court also concludes that the social media posts do not "significantly prejudice" any of the parties. Ms. Lai fails to establish how the inclusion of the posts are "solely to embarrass" her, ECF No. 28-1, or how the inclusion is "cruelly derogatory," *Righthaven LLC v. Democratic Underground*, LLC, 791 F. Supp. 2d 968, 977 (D. Nev. 2011) (defining "scandalous" in Federal Rule of Civil Procedure 12(f)). After all, these *social media* (i.e., presented to the public) posts are creations by Ms. Lai herself, and she uploaded them with *some* public audience in mind.

As such, the Court **DENIES** Ms. Lai's Motion to Strike. Of note, both Ms. Lai and NotPolish present the possibility of filing a subsequent motion to strike pursuant to California's anti-SLAPP ("Strategic Lawsuit Against Public Participation") statute. *See* ECF No. 27 at 7 n.1; ECF No. 28-1 at 4 n.1. Because the issue is mentioned in passing with minimal briefing, the Court is not in position to decide on the issue. The Court will assess the validity of such motions upon filing and the corresponding briefs thereof.

## CONCLUSION

For the reasons discussed above, the two Motions to Dismiss are **GRANTED in part and DENIED in part**, and the Motion to Strike is **DENIED**. Specifically, the Court **DISMISSES without prejudice** Counts Four to Six, and Count Eleven but only as it is predicated on Counts Four to Six. Within <u>thirty (30) days</u> of the filing of this Order,

Plaintiff may file a second amended complaint that is limited to curing any deficiencies raised in this Order.

**IT IS SO ORDERED.**

Dated: June 4, 2021

Hon. Gonzalo P. Curiel
United States District Judge

21-cv-0052-GPC-DEB